Filed 4/30/13  In re C.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.A., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E056862 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ008556) |
| v. | O P I N I O N |
| S.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Shobita Misra, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant S.V. (Mother) is the mother of C.A., a girl born in June 2003 and now nearly 10 years of age.  Mother appeals from the juvenile court's June 28, 2012, orders denying her petition for further reunification or family maintenance services (Welf. & Inst. Code, § 388),[1] terminating her parental rights to C.A., and placing C.A. for adoption (§ 366.26).

Mother raises three claims on this appeal.  She first claims that the juvenile court abused its discretion and denied her a fair hearing in refusing to continue the combined sections 388 and 366.26 hearings on June 28, 2012.  (§ 352.)  She also claims the court abused its discretion in denying her section 388 petition on its merits and in refusing to apply the parental beneficial exception to the statutory preference for adoption at the section 366.26 hearing.  (§ 366.26, subd. (c)(1)(B)(i).)

We find no error and affirm the challenged orders.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A. *The Initial Dependency Proceedings (July 2008-January 2010)*

In July 2008, plaintiff and respondent Riverside County Department of Public Social Services (DPSS) filed a dependency petition regarding Mother's two children, R. and C.A.  C.A. was five years old and R. was six years old.  The children were placed in foster care.  Only C.A. is the subject of this appeal.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The petition alleged that Mother neglected the children by repeatedly leaving them with paternal relatives who did not adequately supervise them. On July 14, 2008, R. was found wandering the streets in Hemet and could not find his home. R. had a history of wandering away from home, and DPSS had repeatedly worked with the family to resolve the problem. The children's father was in prison, and Mother was no longer in a relationship with him.[2]

Mother was 22 years old in July 2008 and was a dependent of the juvenile court from 1998 to 2003. She was homeless, had not completed high school, and was unemployed. She also had a history of drug-related charges and of abusing alcohol, methamphetamine, and marijuana. She first engaged in substance abuse at the age of 15 and began abusing alcohol at the age of 17. She believed that alcohol abuse was her primary substance abuse problem.

An amended petition was filed on September 8, 2008, and on that date the children were declared dependents of the juvenile court. The children were continued outside Mother's custody, and Mother was awarded reunification services and supervised visitation.

Mother enrolled in a substance abuse treatment program in August 2008 and was placed on a waiting list, but failed to attend weekly meetings and dropped out of the

---

[2] The father was released from prison in May 2009 and was immediately deported to Mexico. Father is not a party to this appeal.

program before being drug tested. Between September 2008 and February 2009, she took only three of 10 drug tests and tested positive for alcohol in September 2008.

Mother regularly visited the children on a weekly basis through March 2009, with the exception of one missed visit in November 2008. She called the social worker beforehand to say she could not attend the November 2008 visit, but after that call she stopped communicating with the social worker. As of March 2009, DPSS did not know Mother's address or whereabouts, and Mother had not participated in a parenting program, a domestic violence program, or individual counseling.

In March 2009, the children were separated when R. was placed in a respite foster home. R. was diagnosed with reactive attachment disorder and required psychotropic medications. In the children's previous foster home, R. had angry and aggressive outbursts, and displayed inappropriate physical contact toward C.A. After R. was placed in a respite foster home, C.A. began to thrive and was no longer mimicking R.'s aggressive behavior and tantrums. Still, DPSS wanted to reunite the children in the same home at some point. In September 2009, the children began having weekend visits with their paternal aunt, Mrs. P.

After testing positive for methamphetamine in April 2009 and meeting with the social worker, Mother then enrolled in the MOMS program to address her alcohol and methamphetamine addiction, but was discharged from the program in August 2009 due to 10 absences. The discharge report stated that Mother had made "little progress toward positive change." Mother then acknowledged she needed a higher level of care, but did

4

not follow up on a referral to a sober living home. Mother also missed or canceled a number of visits with the children in June, July, August, and September 2009.

In October 2009, the juvenile court continued Mother's reunification services for three more months. During that period, Mother did not communicate with DPSS, visit or contact the children, or participate in her case plan. Still, the children were expressing "a strong desire" to be with Mother, and were enjoying their weekend visits with their paternal aunt and spending time with their paternal family. Apparently, the paternal aunt, Mrs. P., was in contact with Mother by telephone.

At the 18-month review hearing on January 28, 2010, the juvenile court terminated Mother's services. Mother was not present at the hearing. The section 366.26 hearing was originally set on June 1, 2010, but was continued several times and ultimately held on June 28, 2012.

B. *C.A.'s Special Needs and Placements (July 2008-July 2012)*

In May 2010, shortly before the scheduled section 366.26 hearing on June 1, 2010, DPSS recommended placing both children in a planned permanent living arrangement with Mrs. P., with the goal of legal guardianship. At that time, however, the children were in separate foster homes and were only visiting Mrs. P. and her husband on weekends. C.A. was still living with Mr. and Mrs. C., with whom she was placed in July 2008.

On June 1, 2010, Mr. and Mrs. C. were declared C.A.'s de facto parents. They were willing to adopt C.A., but were reluctant to pursue adoption because they knew that

C.A. wanted to live with Mrs. P. They told the court they were concerned for C.A.'s welfare if she were placed in the same home with R., because both children lived with them from July 2008 until March 2009, when R. was removed from their care and placed in a respite foster home, and during that time the children were sexually acting out together. According to the C.'s, C.A. was "a different person" around R. The children still sexually act out when they are together, and the C.'s are unable to stop it.

Mr. and Mrs. P. did not believe the children were sexually acting out because they had never witnessed it. Nonetheless, DPSS advised Mr. and Mrs. P. that the children needed therapy to address these behavioral problems.

It was still hoped that the children could ultimately be placed together with their paternal family. Thus, in July 2010, C.A. was placed with Mr. and Mrs. P. But by November 2010, Mrs. P. was certain she could not commit to a legal guardianship of C.A.[3] C.A. was having "a lot of behavioral issues" in the P.'s home. She argued with and screamed at Mrs. P., and intentionally dropped her smaller cousin on the floor on more than one occasion. Then, in February 2011, Mrs. P. notified DPSS that she wanted C.A. removed from her home because C.A. was sexually touching Mrs. P.'s younger children, ages two and four, and in April 2011, Mrs. P. asked that C.A. be removed from her home immediately. At that time, C.A. was returned to the care of Mr. and Mrs. C., her de facto parents.

---

[3] R. was in his fifth foster care placement in November 2010, not with Mr. and Mrs. P. R.'s therapist later recommended that R. and C.A. be placed in separate homes.

By December 2011, Mr. and Mrs. C. were again willing to adopt C.A. C.A. was oscillating between wanting to be adopted and wanting to be returned to Mother's care. She was conflicted about choosing an adoptive family over Mother, but she was happy and well-adjusted in the home of Mr. and Mrs. C., and was bonded to them. She called Mr. and Mrs. C. "mom and dad" and "grandma and grandpa."

C. *Mother's Section 388 Petition and the Section 366.26 Hearing*

In June 2010, six months after her services were terminated in January 2010, Mother "resurfaced" and enrolled in an outpatient substance abuse program. After testing positive for marijuana 15 times, she was referred to an inpatient program. Finally, in January 2011, Mother completed a 45-day inpatient program and a parenting course, and began random drug testing. In July 2011, Mother completed a second parenting class and the MOMS outpatient drug treatment program. Between July 2011 and July 2012, however, Mother did not participate in any aftercare program and did not provide DPSS with any drug testing results. Mother also missed a visit with the children during mid-2011.

In January 2012, the court limited telephone calls between C.A. and Mother at the request of DPSS, because Mother had discussed inappropriate topics with C.A. and told C.A. to tell the court that she wanted to be returned to Mother's care. The telephone calls were upsetting to C.A.

On June 21, 2012, Mother filed a section 388 petition seeking further reunification services or family maintenances services and the ultimate return of C.A. to her care. A

7

hearing on the petition was set for June 28, 2012, immediately before the continued section 366.26 hearing.

Mother visited the children between August 2011 and June 2012. On June 28, 2012, Mother failed to appear at the hearing on her section 388 petition and the continued section 366.26 hearing. The court refused to continue the hearings, and denied the section 388 petition on its merits. The court then proceeded to the section 366.26 hearing, terminated parental rights and placed C.A. for adoption. Mother timely appealed.

### III. DISCUSSION

A. *Mother's Request to Continue the June 28, 2012, Hearings Was Properly Denied*

Mother, who was not present at the time of the sections 388 and 366.26 hearings on June 28, 2012, claims the court abused its discretion and denied her "a fair hearing" in refusing her counsel's request, made at the outset of the hearings, to "briefly" continue the hearings to an unspecified date to allow Mother additional time to appear and testify. Under the circumstances, we find no abuse of discretion or due process violation in the court's refusal to continue the hearings.

1. Additional Background

The section 366.26 hearing was scheduled for June 12, 2012. On that date, Mother was present in court, and her counsel requested a continuance so that Mother could file a section 388 petition. The request was granted, and on June 21 Mother filed a section 388 petition, together with documentary evidence showing that one year earlier,

8

in July 2011, she had completed inpatient and outpatient programs, an aftercare program, and two parenting programs. A hearing on the petition was scheduled for June 28, 2012, immediately before the continued section 366.26 hearing.

Mother was not present in court on June 28, 2012. Mother's counsel requested a "brief" continuance of the hearings to allow Mother additional time to appear and testify. Counsel explained that, on June 21, the date Mother's petition was filed, Mother left counsel a telephone message saying she had broken her leg and was scheduled to undergo surgery on June 25. Counsel called Mother back on June 22, but Mother did not "pick up." Counsel then left Mother a voice mail message, and Mother left counsel a return message on June 27.

In her June 27 message to her counsel, Mother indicated she had undergone the surgery on her leg, but she did not say whether she was able to come to court on June 28, and she wanted counsel to call her. Mother's counsel told the court that she tried to call Mother twice on the morning of June 28, "with no luck." Counsel also told the court she understood that Mother had recently completed a hair follicle test showing that she was still drug-free, and that Mother wanted to present the test results in support of her section 388 petition. Counsel had not received the hair follicle test results, however, and did not know whether Mother was going to bring them with her to court. Counsel also did not know whether Mother wanted to testify at the hearings or wanted counsel to call C.A. to testify.

9

Mother's counsel asked the court to continue the sections 388 and 366.26 hearings so that Mother could have additional time to appear and testify, "if she would like, as to the programs she's participated in." Counsel for C.A. objected to the continuances because the section 366.26 hearing was originally set in July 2010; Mother had since had ample time to file a section 388 petition showing her circumstances had changed; and C.A. had "been awaiting permanency" for nearly two years. Counsel for DPSS joined the objection.

The court declined to continue the section 388 hearing but did so, "without prejudice," explaining it would proceed on the petition and would reconsider continuing the matter or conducting a further hearing if, during the presentation of the evidence and arguments, the court found that Mother would be able to provide evidence "that could shed light on" the merits of her petition. The court also pointed out that while it had no doubt that Mother had a "medical need" and "may, in fact, have had surgery," she had an obligation to keep her attorney apprised of her "whereabouts and availability for court," but she had not done so.

Mother's counsel then submitted on the section 388 petition, and argued that Mother had shown changed circumstances and that granting the petition would serve the best interests of C.A. Mother's counsel then asked the court to either grant the petition or continue the matter to allow Mother to come in and testify. Counsel for C.A. argued against granting the petition.

The court accepted and "took it as a given" that Mother would be able to present recent hair follicle test results showing "some level of sobriety at least within the last few months," but pointed out that the documents attached to the petition did not show "any current aftercare, such as [Alcoholics Anonymous] or [Narcotics Anonymous]." On that basis, the court found that Mother had not made a prima facie showing of changed circumstances. (§ 388.)

The court also pointed out that Mr. and Mrs. C., the prospective adoptive parents, had remained dedicated to C.A.'s success throughout the period of her failed placement with Mr. and Mrs. P. The court said that Mr. and Mrs. C. had "maintained a level of stability [for C.A.] that I don't think [C.A.] would be able to have if I were to change this Court order and place [C.A.] back with mom or even give mom another opportunity." Finally, the court said it could not "even envision what mom could testify to today that would change that, considering the amount of time that has passed."

2. Analysis

Continuances are disfavored in child dependency cases, and are not to be granted unless good cause is shown and the continuance would not be contrary to the best interest of the minor. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604; § 352, subd. (a).)[4]

---

[4] Section 352 governs continuances in child dependency cases. It provides: "(a) Upon request of counsel for the parent . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of . . . her custody status, the need to

*[footnote continued on next page]*

11

We will not disturb the court's denial of a request for a continuance absent an abuse of discretion. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. . . .'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) In this regard, we observe that providing children with expeditious resolutions in dependency matters is a "core concern of the entire dependency scheme." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4.)

Mother argues that her "medical emergency," including her June 25, 2012, surgery on her broken leg, constituted good cause for continuing the June 28 hearings, and that a "brief" continuance would not have been contrary to the interests of C.A. because C.A. was already living with Mr. and Mrs. C., her prospective adoptive parents, at the time of the hearings. (§ 352.) Nonetheless, the court did not abuse its discretion, deny Mother a fair hearing, or deprive Mother of her due process rights in refusing to continue the hearings.

---

*[footnote continued from previous page]*
provide children with stable environments, and the damage to a minor of prolonged temporary placements.

"Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance. . . . Whenever any continuance is granted, the facts proven which require the continuance shall be entered upon the minutes of the court.

"In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a); Cal. Rules of Court, rule 5.550(a).)

As the court pointed out, Mother had an obligation to stay in contact with her attorney, but did not do so on June 28, 2012. In her June 27 message to her attorney, she did not tell her attorney whether she would be able to come to court on June 28, or, if not, *when* she could come to court or whether she wanted to testify. Mother also had a lengthy history of dropping out of contact with her attorney and DPSS. Nothing about Mother's medical emergency or broken leg surgery prevented her from contacting her attorney before the June 28 hearings, answering her attorney's questions, and at least telling her attorney when she might be able to come to court.

Moreover, and as the court also pointed out, it is difficult to imagine what Mother could have said that would have shown how giving her another chance to regain custody of C.A. would have served the bests interests of C.A. (§ 388.) C.A. was nine years old at the time of the June 28, 2012, hearings, and was taken into protective custody in July 2008, when she was barely five years of age. Mr. and Mrs. C. were dedicated to her throughout her dependency, and were providing her with much needed stability.

As Mother points out, she had a due process right to "adequate notice and an opportunity to be heard" on her petition (*Adoption of B.C.* (2011) 195 Cal.App.4th 913, 924-925 [Fourth Dist., Div. Two]), and "a fair hearing" on her petition was "'a procedural predicate to proceeding to the section 366.26 hearing and disposition.' [Citation.]" (*In re Michael R.* (1992) 5 Cal.App.4th 687, 695.) Mother also had a due process right to "a full hearing" on her petition *if* she made a prima facie showing that granting her petition, or giving her another chance to regain custody of C.A., would have

13

served the best interests of C.A. (*In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1799; § 388.)

Mother's due process rights were not violated in any respect, however. Mother had ample notice and an opportunity to be heard on her petition, and the court conducted a full and fair hearing on her petition. As the court concluded, even if Mother testified, it is difficult to see how she could have made a prima facie showing that granting her services and another chance to reunify with C.A. would have served the best interests of C.A. (§ 388.) C.A. had severe emotional problems, as indicated by her history of sexually acting out with other children, including her brother, and C.A. very much needed stability. Mother had been clean and sober for one year at most, and had only recently secured suitable housing. Continuing the hearings also would have been contrary to the interests of C.A. because C.A. had been waiting a very long time for permanency. (§ 352.)

Mother's reliance on *In re Michael R.* is unavailing. In that case, the juvenile court erroneously believed it had no discretion to grant the mother's request to continue the section 366.26 hearing to allow her time to complete a drug treatment program that she was ordered to complete as part of her case plan but could not possibly complete before the hearing due to no fault of her own. (*In re Michael R., supra,* 5 Cal.App.4th at pp. 692-695.) The juvenile court erroneously believed that it lacked jurisdiction to grant the mother's request to continue the hearing. (*Id.* at p. 695.) Mother's case is distinguishable because here, the juvenile court understood that it had discretion to

continue the section 388 hearing and properly exercised its discretion to deny the requested continuance.

*In re Hunter W.* (2011) 200 Cal.App.4th 1454 also fails to assist Mother's argument. In that case, the juvenile court prejudicially abused its discretion in refusing to briefly delay or continue a section 388 hearing from 8:30 a.m. to 1:30 p.m., after the parents checked in with the court at 8:30 a.m., but could not be immediately located when the matter was called at 10:20 a.m. (*Id.* at pp. 1460, 1463-1465.) The appellate court concluded that the juvenile court's refusal to briefly delay the matter violated the parents' due process rights (*id*. at pp. 1463-1464), and that delaying the matter to 1:30 p.m. could not have been contrary to the child's best interests (*id*. at p. 1465; § 352).

Here, Mother did not check in with the court on June 28, and her counsel was not asking to delay the hearing to a later time on June 28. Instead, counsel was asking to continue the matter to an unspecified date to allow Mother to come to court and testify, even though Mother had not told counsel when she would be available to come to court or testify, or whether she even wanted to testify. The record also shows that Mother had ample opportunity to fully communicate with her counsel before June 28, notwithstanding her medical emergency.

B. *The Section 388 Petition Was Properly Denied*

Mother also claims the court abused its discretion in denying her section 388 petition on its merits. Again, we find no abuse of discretion.

15

1. <u>Section 388</u>

Section 388 permits "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court" to petition the juvenile court "'for a hearing to change, modify, or set aside any order of court previously made'" on grounds of "'change of circumstance or new evidence.'" (*In re Hunter W., supra,* 200 Cal.App.4th at p. 1463.) The petitioner has the burden of showing by a preponderance of the evidence that there has been a "legitimate change of circumstances" or new evidence, and that the proposed change of court order would promote the best interest of the child. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317; Cal. Rules of Court, rule 5.570(h).) The petition is addressed to the sound discretion of the juvenile court and its decision will not be overturned on appeal unless an abuse of discretion is clearly shown. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

Section 388 is central to the constitutionality of the dependency scheme. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) After a parent's reunification services have been terminated, the parent's interest in the care, custody, and companionship of the child are no longer paramount, and the focus shifts to the child's need for permanency and stability. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317; *In re Marilyn H., supra,* at p. 309.) It is at this point that section 388 "plays a critical role in the dependency scheme." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506.) The statute serves as an "escape mechanism" for parents who "complete a reformation" before their parental rights have finally been terminated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.)

16

2. Additional Background/The Section 388 Petition

At the June 28, 2012, hearing on her petition, Mother's counsel pointed out, and documents attached to the petition showed, that as of July 2011, Mother had completed inpatient and outpatient substance abuse programs, an aftercare program, and two parenting programs. Counsel also pointed out that the hair follicle test, which counsel believed Mother had taken, would show that Mother was currently sober and had not relapsed since July 2011. Mother had also obtained a suitable residence "on her own," and a copy of her lease agreement was attached to the petition. Counsel argued that, if Mother were present and testified, she would explain that she had been paying her rent and supporting herself through housekeeping work and "other types of employment." She would also "elaborate on the programs that she [had] participated in," what she was doing to remain sober, and her employment.

Regarding Mother's failure to file a section 388 petition sooner, Mother's counsel explained that Mother felt she needed to show she could maintain her sobriety for a longer period of time than four to six months. Regarding the best interests of C.A., Mother's counsel argued that granting Mother additional services would promote the best interests of C.A. because Mother had consistently visited C.A., and C.A. was "ambivalent about being adopted by any other parties at this time."

Counsel for C.A. offered, and the court accepted, the stipulated testimony of C.A., then nine years of age, that "she has visits with her mom and she likes those visits, [and] she would ultimately like to live with her mom and brother again."

17

While conceding that Mother "may have changed [her] circumstances," counsel for C.A. argued against granting the petition on the ground that allowing Mother another chance to reunify would not serve the best interests of C.A. Counsel for C.A. reminded the court that C.A. and R. were "sexually acting out with each other," when they were placed together with Mr. and Mrs. C., and as a result C.A. and R. "ultimately had to be separated." C.A.'s placement with Mr. and Mrs. P. also failed after she began acting out in that placement.

Counsel for C.A. emphasized that Mr. and Mrs. C. remained dedicated to C.A. throughout her failed relative placement, and C.A. had not acted out in their home since she was returned to their care. In short, it was not practical to expect that C.A. could reunify with her Mother and brother "in the near future," the de facto parents were willing to facilitate visits between C.A., R., and Mother, and further delaying C.A.'s permanency would be unfair to C.A. Counsel for DPSS joined these arguments and also questioned whether Mother had demonstrated changed circumstances, given that her "documents were silent" on what she had been doing since July 2011.

As discussed, in denying the petition the court accepted and "took it as a given" that Mother would be able to show she was currently sober based on a clean hair follicle test, but noted that the documents attached to her petition did not show she was participating in any current aftercare, such as Alcoholics Anonymous or Narcotics Anonymous. On that basis, the court concluded that Mother did not make a prima facie showing of changed circumstances.

The court also found that granting the petition would not serve the bests interests of C.A. (§ 388.) While the court gave "great deference" to C.A.'s wish to be returned to her Mother's care, the court said it also had to recognize that "sometimes an eight- or nine-year-old child doesn't always know what's best," and concluded that, at this point in the proceedings, Mother could not demonstrate that she could provide C.A. with the level of stability she needed and the de facto parents could.

3. Analysis

Mother claims the court abused its discretion in denying her section 388 petition because, at the time of the June 28, 2012, hearing, she showed both that her circumstances had changed since her reunification services were terminated in January 2010 and that granting her additional services and another chance to reunify with C.A. would promote the best interests of C.A. (§ 388.)

Assuming, as the juvenile court did, that Mother *could have shown* she was drug-free and sober in July 2012, and her circumstances had changed since her services were terminated in July 2010, the court reasonably determined that granting the petition would not have served the best interests of C.A. C.A. was nine years old in June 2012 and had been a dependent since July 2008 when she was five years old. C.A. very much needed stability, given the length of her dependency and her history of emotional problems, as indicated by her sexually acting out with her brother and other children.

And even though C.A. was bonded to Mother and said she wanted to live with Mother, C.A. was also happy and well-adjusted in her de facto parents' home, was

19

bonded to them, and called them "mom and dad" and "grandma and grandpa." And as the court pointed out, even if Mother had been present and testified at the hearing, it is difficult to see how she could have shown that she could provide C.A. with the level of stability and care that C.A. so very much needed and that the de facto parents were willing to continue providing.

Mother points out that the court in *In re Kimberly F.* set forth three factors for juvenile courts to consider in determining whether a change of a prior order is in the child's best interests: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532 ["this list is not meant to be exhaustive"].)

Based on these criteria, Mother argues that granting her petition was in the best interest of C.A. because: (1) Mother resolved the problems which led to C.A.'s dependency, namely, her alcohol and other substance abuse problems; (2) C.A. was very bonded to Mother; and (3) C.A. wanted to live with Mother and R. Mother's analysis completely disregards C.A.'s bond with Mr. and Mrs. C., C.A.'s emotional problems, and C.A.'s acute need for stability. Mr. and Mrs. C. had long provided C.A. with much needed stability, and were willing to continue to provide that stability. Under these

circumstances, the court did not abuse its discretion in denying Mother's petition on its merits.

C. *The Court Properly Declined to Apply the Parental Benefit Exception*

Lastly, Mother claims the juvenile court abused its discretion in refusing to apply the parental benefit exception at the section 366.26 hearing. (§ 366.26, subd. (c)(1)(B)(i).) Again, we find no abuse of discretion.

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal rights of the child's natural parents, but guardianship and long-term foster care leave parental rights intact. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) "Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)

In order to avoid adoption and termination of parental rights at a section 366.26 hearing, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469; *In re Celine R.* (2003) 31 Cal.4th

21

45, 53.) These exceptions "merely permit the court, in *exceptional circumstances* (*In re Jasmine D.* [(2000) 78 Cal.App.4th 1339,] 1348-1349]), to choose an option other than the norm, which remains adoption." (*In re Celine R., supra,* at p. 53).

The parental benefit exception applies when two conditions are shown: the parent has "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In order to show that the child would benefit from continuing the relationship with the parent, the parent "must do more than demonstrate . . . an emotional bond with the child"; the parent "must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

The parent must also show that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of

22

the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.] When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption.' [Citation.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at pp. 1349-1350.)

In other words, "[i]f severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

1.  Standard of Review

Appellate courts have applied both the substantial evidence test and the abuse of discretion test in considering challenges to juvenile court determinations that the parental benefit exception did not apply. (*In re Scott B., supra,* 188 Cal.App.4th at p. 469.) There is little, if any, practical difference between the two. (*Ibid.*)

As explained in *In re Jasmine D.*: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

23

2. Analysis

In refusing to apply the parental benefit exception, Mother claims the juvenile court abused its discretion in concluding that C.A.'s need for stability outweighed C.A.'s "important" and undisputed parental bond with Mother. We disagree.

Given C.A.'s needs and circumstances, the court reasonably determined that the benefits C.A. would realize from being adopted substantially outweighed the benefits that C.A. would realize from maintaining her relationship with Mother. C.A. was only nine years old in June 2012 and very much needed stability and permanency. C.A. had a history of acting out sexually with other children, including her brother, and suffered from emotional problems. Mr. and Mrs. C. remained dedicated to C.A.'s success throughout her dependency.

Further, there was no evidence that severing C.A.'s relationship with Mother by terminating parental rights would greatly harm C.A. (*In re B.D., supra,* 159 Cal.App.4th at p. 1235.) Although C.A. had a bond with Mother, she was also closely bonded with Mr. and Mrs. C., called them "mom and dad" and "grandma and grandpa," and was happy and well-adjusted in their home. Thus here, Mother did not demonstrate that C.A. would benefit more from maintaining a relationship with Mother than she would benefit from being adopted into a stable, permanent home.

Lastly, we note that section 366.26, subdivision (h) provides: "At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child." Here, the court complied with the statute. It acknowledged and

24

considered C.A.'s wish to live with Mother, but acted in C.A.'s best interests, concluding that the parental benefit exception did not apply, in terminating parental rights, and in placing C.A. for adoption.

## IV.  DISPOSITION

The orders denying Mother's section 388 petition, terminating parental rights to C.A., and placing C.A. for adoption are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
Acting P. J.


We concur:

MILLER
J.

CODRINGTON
J.